Lyons v. Lyons, 21 Haw. 474.

## ROSALIE LYONS *v.* THOMAS BENJAMIN LYONS.
## THOMAS BENJAMIN LYONS *v.* ROSALIE LYONS.

APPEALS FROM CIRCUIT JUDGE, SECOND CIRCUIT.

ARGUED FEBRUARY 24, 1913.                DECIDED MARCH 12, 1913.

ROBERTSON, C.J., PERRY AND DE BOLT, JJ.

DIVORCE—*extreme cruelty.*

Extreme cruelty, as a ground for divorce, implies physical injury, either actual or apprehended. Personal violence need not be shown, but the infliction of mental suffering is not a ground for divorce unless its actual or reasonably apprehended effect is injurious to the health of the complaining party.

ID.—*neglect to provide suitable maintenance.*

Where a wife sues her husband for a divorce on the ground of neglect to provide suitable maintenance, she is not entitled to a divorce upon the evidence adduced, which shows that the home in which they live was paid for by the wife; that she has a monthly income of about $125; that the husband has no property or income other than a monthly salary of about $100; that he pays the meat bill, the laundry bill, the yard boy, the taxes and the premiums on certain insurance policies, which practically consume his entire salary.

ID.—*habitual intemperance.*

Where a wife sues her husband for a divorce on the ground of habitual intemperance and, while the evidence tends to show that the husband indulged in the use of intoxicating liquor to a considerable extent, but that it was not such a frequent indulgence to excess as to show the existence of a confirmed habit and inability to control his appetite, such use is not ground for divorce.

ID.—*evidence—preponderance—reasonable doubt.*

A suit for divorce is a civil case, and a libellant need only establish the grounds for a divorce by a clear preponderance of the evidence; the criminal law rule that guilt must be proved beyond a reasonable doubt being inapplicable where a spouse is charged with matrimonial misconduct.

ID.—*adultery.*

Under the circumstances as disclosed by the evidence the charge of adultery was proven.

OPINION OF THE COURT BY DE BOLT, J.

On May 15, 1912, Rosalie Lyons filed her libel praying for an absolute divorce from her husband, Thomas Benjamin Lyons, alleging three separate grounds: (1) Extreme cruelty; (2) neglect to provide suitable maintenance; (3) habitual intemperance. On the same day Mr. Lyons filed his libel praying for an absolute divorce from Mrs. Lyons, alleging as a ground therefor the adultery of Mrs. Lyons with one Samuel Keliinoi.

The cases were tried together and the circuit judge finding that none of the allegations contained in Mrs. Lyons' libel were proven, except the jurisdictional facts, he prepared and entered a decree dismissing her libel. As to Mr. Lyons' libel the circuit judge found from the evidence adduced that the charge of adultery against Mrs. Lyons was sustained, and Mr. Lyons having expressed his desire for a divorce only from bed and board, the circuit judge prepared and entered a decree accordingly, and not for an absolute divorce.

Mrs. Lyons appealed from both decrees, which appeals will be considered together.

The parties were married on or about January 18, 1894, and continued to live together as husband and wife until on or about May 13, 1912, when they separated. At the time of their marriage Mrs. Lyons was about eighteen years of age and Mr. Lyons was about twenty-four years of age. They have resided since their marriage in Wailuku, Maui, except for a few months, when they resided in Hana, Maui. Nine children were born to them, six of whom—all boys—are living, and at the time the libels were filed they were aged, respectively, seventeen, fourteen, eleven, eight, seven, and three years. The two eldest had been in Honolulu for some time prior to the filing of the libels. One was working, taking care of himself, and the other was attending Kamehameha school.

The several grounds for divorce as alleged in the respective libels will be considered in the order above named:

1. Extreme cruelty. Actual personal violence was neither

alleged nor sought to be proved. There was some evidence, however, tending to show that on one occasion Mr. Lyons pushed a heavy table towards Mrs. Lyons which she says would have struck her had she not got out of the way, and that on another occasion he told the Japanese girl, Koniko, who was living with the Lyons' family, that he would shoot Mrs. Lyons. Otherwise, the charge of extreme cruelty was sought to be established by evidence tending to show the use of vile and abusive language, including charges of adultery made in the presence of others, which charges, Mrs. Lyons claims, were false and malicious. There was evidence tending to show that on various occasions, while intoxicated, Mr. Lyons, in the presence of others, called Mrs. Lyons a whore and accused her of having committed adultery with several men, including Samuel Keliinoi.

When asked as to Mr. Lyons' conduct towards her "as being kind or unkind," she said: "He has been all right as long as he did not drink. But when he started to drink he got to be very abusive. He insulted me,—he did not care who was at the house. He was very abusive. When he came home, he would not hesitate to call me all manner of names. He would abuse me and call me   *   *   *   a whore." When asked how long he had called her such names, she said: "He has always done it. As soon as he was under the influence of liquor he would call me those names." When asked as to the first time that he accused her of unfaithfulness, she said: "Years ago. Long years ago. He used to tell me that I was not true to him and I used to tell him: 'Of course I am.' Then he said: 'You are a damn liar.' I said: 'What have you heard? Have I done anything to show you that I am not true to you?' Then he'd say, 'I heard stories. I heard people talking about you.' I told him that if I was to believe everything that I heard about him we would have all kinds of trouble." When asked if he ever accused her of "unfaithfulness with any one man before the time he first accused you of being untrue to him and having relations with Sam Keliinoi," she said: "Oh, yes, he did. He

has accused me with several. He named several and one a negro." When asked if he ever made such accusations except when drunk, she said: "No. Only when he was drunk. When he was sober he was all right."

In answer to the question: "What effect if any have these accusations that he has made against you had upon your health?" she said: "I have been very miserable. It has made me very miserable. Many is the time that I have been unable to eat or sleep. Just worried me."

She does not say nor does the record show that these accusations had any injurious effect upon her health, or caused her any bodily injury, or created an apprehension of any bodily injury. "While drunkenness was no excuse for calling her vile names under any circumstances, yet the injurious effect thereof upon her mind," even though the accusations were groundless, "should not have been, and probably was not, so bad as if he had deliberately called her by those names when he was sober." *Waldron* v. *Waldron,* 9 L. R. A. 487, 491. However reprehensible the accusations may have been, under the circumstances of this case, they cannot be regarded as sufficient to establish extreme cruelty. "Cruelty is any conduct in one of the married parties which, to the reasonable apprehension of the other, or in fact, renders cohabitation physically unsafe, to a degree justifying a withdrawal therefrom." 1 Bish. Mar., Div. and Sep., §1431.

"The prevailing view seems to be that personal violence is not necessary, but that it is sufficient if the conduct is such as to impair the health or produce bodily injury or such as to create an apprehension of bodily injury. The usual test seems to be physical injury, but this may be actual or apprehended, and may be direct or indirect through mental suffering. Mental suffering is not generally deemed sufficient unless it is such as to impair the health, in other words, if mental suffering is sufficient, its test is generally that it impairs the health." *Bartlett* v. *Bartlett,* 13 Haw. 707, 708. See also *Bruns* v. *Bruns,*

ante 284, 287; *Waldron* v. *Waldron*, 9 L. R. A. 487; *Robinson* v. *Robinson*, 15 L. R. A. 121; *Maddox* v. *Maddox*, 52 L. R. A. 628.

In view of the conclusion we' have reached as to the charge of adultery contained in the libel filed by Mr. Lyons, we cannot say that the accusations made by him against his wife, before the filing of the libel, were made maliciously and without probable cause.

2. Neglect to provide suitable maintenance. The evidence adduced at the trial, as shown by the record before us, was not sufficient to sustain this charge. The evidence tends to show these facts: That the home in which Mr. and Mrs. Lyons had lived for a number of years next preceding the filing of the libels was paid for with Mrs. Lyons' money; that during the greater portion of the time mentioned she has had a monthly income of about $125, which she has contributed towards the support of the family; that Mr. Lyons had no property at the time of the marriage and has acquired none since; that at the time of the marriage he was receiving a monthly salary of about seventy-five dollars, and during the time above mentioned has had no income other than a monthly salary of seventy-five to one hundred and twenty-five dollars; that he paid the meat bill, the laundry bill, the yard boy, the taxes and the premiums on certain insurance policies, which practically consumed his entire salary.

3. Habitual intemperance. We are not aware of any established legal definition of the words, "habitual intemperance," but for all practical purposes it would seem that to constitute habitual intemperance there must be such a frequent indulgence to excess as to show the existence of a confirmed habit, and an inability to control the appetite. 14 Cyc. 623; *Dennis* v. *Dennis*, 34 L. R. A. 449.

Mrs. Lyons testified that her husband drank intoxicating liquor almost every day during the whole of their married life; that during the last few years he has been drinking a little more

than he did formerly; that she has seen him on two or three occasions unable to take care of himself.

Sam Keliinoi testified that during the two years next preceding the trial he had seen Mr. Lyons drunk thirty or forty times, and that he was unable on eight or ten of those occasions to take care of himself.

John V. Kerr testified that he had known Mr. Lyons thirty-five years; that he had seen him almost every day during the two years next preceding the trial and that he did not think he had seen him drunk during that time; that he was a very light drinker. "Probably there is not a man in the Islands that takes as small a drink as he does."

W. A. McKay, district magistrate of Wailuku, testified that he had known Mr. Lyons about thirty years; that he was not very intimately acquainted with him; that he saw him nearly every day, and that he had never seen him drunk.

While it may be conceded that Mr. Lyons indulged in the use of intoxicating liquor to a considerable extent, still, we cannot say that it was "such a frequent indulgence to excess as to show the existence of a confirmed habit," nor does the evidence show "an inability to control the appetite," if he had such appetite. It does not appear that his drinking ever caused him to be absent from his business or work, or occasioned him the loss of any position or employment, or caused any trouble between him and his employer, or disqualified him from attending to his business during the time usually devoted to business. We think it highly improbable for a man to habitually indulge to excess in the use of intoxicating liquor without suffering some loss to his business. Thus, in *Mahone* v. *Mahone,* 19 Cal. 627, 629, the court said: "If there is a fixed habit of drinking to excess to such a degree as to disqualify a person from attending to his business during the principal portion of the time usually devoted to business, it is habitual intemperance—although the person may at intervals be in a condition to attend to his business affairs."

4. Adultery. The libel filed by Mr. Lyons alleges: "That at the home of the libellant at Wailuku, County of Maui, Territory of Hawaii, at divers and many times during the two years immediately prior to the 13th day of May, A. D. 1912, the exact dates being unknown to libellant, and particularly at divers and many times during the months of November and December, A. D. 1911, at said place, the particular dates being unknown to libellant, the said libellee, Rosalie Lyons, in utter disregard of the sanctity of the marriage state did commit adultery with one Samuel Keliinoi."

Samuel Keliinoi boarded with the Lyons family from July or August, 1910, until about the middle of April, 1912. He roomed elsewhere.

It appears that Mrs. Lydia Heine, whose deposition was taken in Honolulu and read at the trial, went from Honolulu to the Lyons home in Wailuku the last week in October, 1911, and remained there about two months. She testified that she saw Mrs. Lyons and Keliinoi kissing often; that they asked her not to say anything to any one, and to keep it as a secret, which she agreed to do; that she first saw them kissing in Honolulu, at her home, before she went to Wailuku; that they were very affectionate towards each other; that Mrs. Lyons told her there was a lot of difference between Keliinoi and Ben, because Ben was so cold toward her and Sam showed a great deal of affection toward her; that she saw them in bed together more than ten times, it may have been as many as fifteen times; that Keliinoi kept his pajamas there; that Mrs. Lyons told her to put them away for her so that Koniko would never see them, and that she did so put them away; that Mr. Lyons went to Honolulu on two occasions while she was at the Lyons' home; that during his absence on the first occasion she saw Keliinoi in Mrs. Lyons' bed room at night, but not very often; that during Mr. Lyons' second absence "most of the time he was sleeping with Mrs. Lyons. I can remember one special date that they were together in bed, which was during the water carnival

at Puunene, and a dance also—that was December the 9th;" that a child was born to Mrs. Lyons on Wednesday, November 22, 1911, .and was buried on Friday of the same week; that Keliinoi told her that it was "God's wish that the child was taken away, because it bears a perfect picture of his little girl Pauahi;" that he said "if the child had lived, it would cause trouble in her home;" that he said the child was his; that he said he knew the child was his, because, during the time Mrs. Lyons was in Honolulu, he was with her quite often; that after her return to Honolulu she received a number of letters from Mrs. Lyons all of which she destroyed at the request of Mrs. Lyons, except two. In one of these, dated March 8, 1912, Mrs. Lyons says, referring to Koniko and some stories she had heard: "Lydia, I thought it could not be true and denied it right away, until I received a letter by the Mikahala last Wednesday that my poor girl has told a party or two that she left me on account of uncle Sam, as Ben threatened to shoot me, etc. Lydia, you know most of my secrets and if you love me a little bit, as I believe you do, ask Koniko to write to the father denying those stories should he ever hear it, for do you know that our home will be in ruins if such things come to uncle Ben's ears. This will be the 1st and last favor I shall ever ask of you and Koniko to try and shield me no matter what the world does or says. * * * Lydia, I have seen the error of my ways and this cruel bitter lesson has shown me the only way and I shall profit by it. Whatever you do don't throw me down."

It appears that Mrs. Heine became incensed at something Mr. Keliinoi is supposed to have said derogatory of her character, whereupon she wrote him on March 6, 1912, saying, among other things, "if ever I get a nasty letter from any of you people I will certainly come out with things for I am very sore of such dirty talks."

Keliinoi showed this letter to Mrs. Lyons, and on March 9, notwithstanding the fact that she had written Mrs. Heine the day before, she wrote her again as follows: "My dear Lydia:

Uncle Sam just showed me your letter to him and your threat
to tell all you know of his actions, even if bad friends were the
results.    My dear girl, I could not believe my eyes when I read
those few lines, surely you cannot believe that Uncle Sam would
tell such stories about you and a hack-driver, although to tell
you the truth when we read about that accident in the papers
he did mention that may be it was you, as he had heard a
rumor about a hack-driver while in Honolulu; but as to accus-
ing you of anything bad, Lydia, believe me, it is not true and
he would be the very last to say such things of you.    Whoever
wrote you such a letter is no true friend of yours and of course
if you have made up your mind to ruin my home and make me
unhappy, I suppose I shall suffer, but believe me Lydia you
never had a person who thought more of you, or who would do
more for you in your troubles than I would and this is no lie.
Of course those who would like to see me in trouble will invent
any kind of story to you, so as to hear all you can say of us
and about us, but Lydia, those are no true friends of you and
if you would only tell them to mind their own business they'll
catch on to themselves and stop trying to make trouble.    I am
not pleading my cause with you for myself, but for my little
ones, those little ones who have learned to love you, and Lydia
you are a mother, and no matter what my faults are my love
is for my little ones.    The day might come when you will be
placed in the same cruel position as I am today, Heaven grant
your mother-heart will never suffer as mine is as I write this.
If it is bad friends you want to be with me there are other
ways of doing it than breaking up my home, and causing me
untold unhappiness.    I have always tried to be a good and
kind friend to you and no one knows it better than you do.
Why strike at me through Sam and all because of some untrue
story a false friend tells you.    If I were to believe everything
I hear then we would have been bad friends long ago.    But
Lydia, I trusted you then as I trust you now and simply will
not believe.    You do the same, my dear, it is the best policy.

Lyons v. Lyons, 21 Haw. 474.

I can write no more. Do what you think best. Sam really has never talked about you as bad as they make out, in fact. I've tried to ask him questions and nothing doing. Uncle Ben is the only one who is wild and accuses everybody but it is not our fault, and drinking helps it along."

Rebecca Lum Lum, a girl between fifteen and sixteen years of age, testified that she lived for a time in the Lyons' home; that on one occasion, Mr. Lyons being in Honolulu, she saw Keliinoi between nine and ten o'clock at night in Mrs. Lyons' bed, partly covered up,—Mrs. Lyons being in the kitchen at the time; that on another occasion, Mr. Lyons being at work, between ten and eleven o'clock in the forenoon, she saw Keliinoi sitting on a trunk in the closet of Mrs. Lyons' bed room; that she saw Mrs. Lyons and Keliinoi kissing many times.

Mr. S. F. Chillingworth, a member of the bar of this court, testified that, shortly before the institution of these proceedings, in the course of a "wordy war" between Mr. and Mrs. Lyons, he "interfered" at the request of the husband and urged the wife to return to Wailuku and "resume their family relations," and that Mrs. Lyons replying said, "I will not go back—I will not give him up." He added that he had "been speaking of her suspected association with Mr. Keliinoi" and that "when she said 'him' it conveyed to my (his) mind Mr. Keliinoi;" and that "it could not possibly be Ben," the husband.

Counsel for Mrs. Lyons contends that the testimony of Mrs. Heine cannot be relied upon, urging in that respect that she was filled with spite, malice and anger towards Keliinoi. It does not appear, however, that she threatened to invent any story, or to tell what was not true, but on the contrary, to tell what she knew concerning Mrs. Lyons and Keliinoi. It is apparent that both Mrs. Lyons and Keliinoi so understood her letter. Mrs. Heine in her letter to Keliinoi does not even mention the name of Mrs. Lyons. Still, Mrs. Lyons did not hesitate to assume that Mrs. Heine referred to her as well as to Keliinoi. Hence, the letter of March 9. Mrs. Heine by rea-

son of her anger cast aside the bond under which she had obligated herself not to divulge their secrets.    It will be observed that Mrs. Lyons in her letters to Mrs. Heine, does not even intimate that Mrs. Heine had told her or was about to tell anything which was untrue.    She pleads with Mrs. Heine with the single hope that she may prevail upon her not to draw aside the veil of secrecy.

Whatever probative force, if any, Mrs. Heine's testimony standing alone would be entitled to, we need not say.    No fact, generally speaking, stands alone in the trial of any cause.    A single fact may be absolutely meaningless in and of itself, but cogent in association with other facts.

Counsel urges upon the court the fact that both Mrs. Lyons and Keliinoi strenuously deny the charge of adultery.    The denial has but little force viewed in the light of the chain of incriminating circumstances disclosed by the record before us. "The paramour is an admissible witness; but, being *particeps criminis,* his evidence is but weak." · 2 Greenl. Ev. (14 ed.) §46.    "The mere fact that the evidence is conflicting or that guilt is explicitly denied does not preclude a divorce for adultery."    14 Cyc. 692.

"The charge of adultery may be sufficiently proved by evidence of circumstances leading to an inference of guilt.    It is impossible fully to indicate the circumstances which will lead to a conclusion, because they may be infinitely diversified by the situation and character of the parties, and by many other incidental matters which may be apparently slight and delicate in themselves but which may have most important bearings in the particular case.    While the circumstances need not be such that an inference of guilt is the only possible conclusion, yet the facts must be such as to lead a just and reasonable man to the conclusion of guilt."    14 Cyc. 693, 694.

Lord Stowell, in the case of *Loveden* v. *Loveden,* 2 Hagg. Con. 2, 3, said:    "It is a fundamental rule, that it is not necessary to prove the direct fact of adultery; because if it were

otherwise, there is not one case in a hundred in which that proof would be attainable; it is very rarely, indeed, that the parties are surprised in the direct fact of adultery. In every case, almost, the fact is inferred from circumstances, that lead to it by fair inference as a necessary conclusion; and unless this were the case, and unless this were so held, no protection whatever could be given to marital rights. What are the circumstances which lead to such a conclusion cannot be laid down universally, though many of them, of a more obvious nature and of more frequent occurrence, are to be found in the ancient books; at the same time, it is impossible to indicate them universally, because they may be infinitely diversified by the situation and character of the parties, by the state of general manners, and by many other incidental circumstances, apparently slight and delicate in themselves, but which may have most important bearings in decisions upon the particular case. The only general rule that can be laid down upon this subject is, that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion; for it is not to lead a rash and intemperate judgment moving upon appearances, that are equally capable of two interpretations,—neither is it to be a matter of artificial reasoning, judging upon such things differently from what would strike the careful and cautious consideration of a discreet man. The facts are not of a technical nature: they are facts determinable upon common grounds of reason; and courts of justice would wander very much from their proper office of giving protection to the rights of mankind, if they let themselves loose to subtleties, and remote and artificial reasons upon such subjects. Upon such subjects the rational and the legal interpretation must be the same."

5. Counsel for Mrs. Lyons contends that adultery as a ground for divorce cannot be established by a mere preponderance of the evidence. He, therefore, invokes the criminal law rule that guilt must be proved beyond a reasonable doubt.

"The general rule is that in civil cases a charge of crime

need not be proved beyond a reasonable doubt, and that a preponderance of evidence is sufficient." 17 Cyc. 756. A suit for divorce is a civil case. Hence, a libellant need only "establish the grounds for a divorce by a clear preponderance of evidence; the criminal law rule that guilt must be proved beyond a reasonable doubt being inapplicable where a spouse is charged with matrimonial misconduct." 14 Cyc. 687. See also *Allen v. Allen,* 101 N. Y. 658; *Lindley* v. *Lindley,* 68 Vt. 421; *Poertner* v. *Poertner,* 66 Wis. 644.

In holding that adultery in a divorce case may be shown by a preponderance of the evidence, we do not wish to be understood as intimating that the charge of adultery in this case was not established beyond a reasonable doubt.

6. Counsel for Mrs. Lyons also contends, quoting from his brief, "that the decree of separation entered by the circuit judge was without authority, unauthorized, erroneous and should be reversed." He then quotes as follows from section 2228, R. L.: "But if the party applying for a divorce shall not insist upon a divorce from the bond of matrimony, a divorce only from bed and board shall be granted, and the relations of the parties after such divorce shall be regulated by existing laws concerning separation." Then, continuing, he says: "Under this provision it is imperative that in order to be entitled to a decree of separation the evidence must show that the party applying is entitled to a divorce." The evidence adduced, in our judgment, was clearly sufficient to entitle Mr. Lyons to a divorce on the alleged ground of adultery. Hence, the circuit judge had power to enter a decree of separation.

7. The decree entered by the circuit judge in favor of Mr. Lyons was as follows: "That the libellant and the libellee be separated as to bed and board from the filing of this decree until the 18th day of January 1914, or until further order of the court; that no disposition or change of use or possession of their properties is made; that the wife, the libellee, is given the right, if she wishes, to with the said children use and occupy the large,

Lyons v. Lyons, 21 Haw. 474.

main residence building fronting on 'Main street in Wailuku, Maui; and that the libellant, the husband and father, may have the use and benefit of the two small residence cottages facing on the back street behind the residence premises in Wailuku; that so far as is convenient and not improper intrusion both and each party may have free access to and be at home in all or any of the home properties and the grounds and yards on which they are situate and each have the fullest opportunities to associate with and be with their said children and that the children are not without further order of the court to be given exclusively to either parent and not to be taken from either of the parties but remain to all intents and purposes as one family with father and mother at the head of it in every respect except that the husband and wife are not to occupy the same table or the same bed; that the libellant as husband and father and the natural and legal head of the family shall have the right, power and duty to keep from each and all parts of said premises the said co-respondent, Samuel Keliinoi, and not to allow him thereon; and to in every way see that persons of ill repute and who are objectionable on moral grounds are kept away from intercourse with the said wife and the said children; that for the support of the said children, the libellant shall pay to the clerk of this court on the 15th day of each calendar month the sum of fifty dollars which the clerk is to hand over to the libellee for such purpose; that neither parent is to dispute or interfere with the government of the other in the care and government in a proper way of their said children; that the costs of this suit be paid by libellant; that neither party do any act or use any language or sign to aggrieve, make angry or hurt the feelings of the other party; but if they speak to each other or attempt to have any verbal intercourse or dealings, they must do so kindly, politely, without attempt to stir up ill-feelings and start quarrels; that during said time neither party shall begin any quarrel or contention or controversy with or against the other, but shall be quiet and, as far as in them lies, peaceable and harmonious;

that neither party shall talk against or complain against the other to any other people not of their family or to or with their neighbors, but refrain from discussing each other so as not to stir up hatred one of the other; that if either party violates the letter or the spirit of this decision, judgment and decree during said period, the other party may come to the court for its protection. This decree shall take effect on the 16th day of November, 1912."

The decree dismissing Mrs. Lyons' libel is affirmed.

With regard to the decree of separation we approve the conclusion that the parties be divorced from bed and board until January 18, 1914, and that Mr. Lyons shall pay to the clerk of the court on the 15th day of each calendar month the sum of fifty dollars, which the clerk shall pay over to Mrs. Lyons for the support of the children. We disapprove, however, of the other matters set forth in the decree, some of which are utterly impracticable and some being matters over which the court has no jurisdiction. Provision should be made for the custody of each of the children, the parent to whom such custody shall not be awarded to be permitted to visit such child or children at reasonable hours during the day time. Upon both parties having an opportunity to be heard we direct that a decree, in plain simple language, in the usual form be entered covering the three provisions above mentioned.

The decree of separation as entered is disaffirmed for the reasons stated, and the cause is remanded to the circuit judge with directions to reform the decree as entered, and for such further proceedings as may be necessary in conformity with this opinion.

*R. P. Quarles* for Mrs. Lyons.
*Wade Warren Thayer* for Mr. Lyons.